[Crim. No. 2324. First Dist., Div. One. Mar. 23, 1945.]

THE PEOPLE, Respondent, v. JULIAN CASTRO et al., Appellants.

Leo R. Friedman and Nathan C. Coghlan for Appellants.

Robert W. Kenny, Attorney General, David K. Lener, Deputy Attorney General, Edmund G. Brown, District Attorney, and Thomas C. Lynch, Deputy District Attorney, for Respondent.

WARD, J.—A jury convicted defendants of robbery, perpetrated while armed with revolvers. A motion for a new trial was denied. Each has appealed from the judgment and order affecting him, and filed separate briefs in support of his appeal.

Each claims that irrelevant evidence, prejudicial to him, was introduced, which resulted in a verdict based upon passion and prejudice. In addition appellant Matas contends that the court erred in an instruction touching the doctrine of reasonable doubt.

John Icardi and his wife operate a grocery store in San Francisco. Between the hours of 10 and 10:30 p. m. on November 20, 1943, while they were engaged in working on their books in a room back of the store, they heard the door open. Icardi advanced to the middle of the store, while his wife remained in the doorway. Two young men, each with a white handkerchief over his nose and his hat pulled down over his eyes had entered; both were carrying revolvers. As the two approached Icardi they said "hold up." Icardi replied "Go on, beat it" to which they responded "this is no time to joke, this is real" and advised him to give them the money. The smaller man instructed the other to take care of Icardi, and between them they secured about $90, part of which was taken from the person of Icardi and part from the cash register. Three weeks later the defendants were arrested in Los Angeles, at which time Castro had an automatic pistol in his possession, and Matas, two guns. Both men were away without official leave from the United States Army. On the trial each offered as a defense, an alibi. Castro, supported by an-

other witness and his sister-in-law, testified that he attended a theatre on the night in question until 11 p. m. and then visited a restaurant until after midnight. Matas, supported by his sister, contended that he had spent the evening with her visiting concessions at the beach; that thereafter they had gone to her home, which he left about midnight.

The identity of the defendants is the main question on appeal. The victims, Mr. and Mrs. Icardi, testified that they had never seen either of the perpetrators of the offense before the day of its commission. The husband and wife admitted "scare" at the time of the holdup. There is testimony in the way of identification from one or the other on the following points: a portion of the head of each defendant was visible; one had "black hair and curly" and was recognized thereby. The voice, walk, general appearance and clothing of the robbers tended to identify one or the other of the appellants. It is true that the husband and wife seemed to have some difficulty upon direct and cross-examination in understanding questions and in expressing themselves, but there is substantial evidence placing each appellant at the scene of the robbery as a participant.

There is some suggestion in the briefs that at the time of defendants' identification, some six weeks after the commission of the offense, Mrs. Icardi had been coached by the police relative to the position of each defendant in a "line up" with some fifteen or twenty other men. The claim is made upon the following testimony: "Q. Did the police say anything as to who to look for? A. The police? Q. Were you told to look for any particular men? A. Yes, when they come out the door I say they look like the boys. Q. I am afraid you don't understand me. About 20 or more people came out of the door? A. Yes. Q. And the police told you to look at the first two persons that came out? A. (Witness nods affirmatively.)" From her statement: "That is all the two men I see" the jury may have concluded that the sight of the first two was sufficient; that it was unnecessary to look further.

On appeal "In a case such as the present one, where there is positive direct testimony that the defendant was one of the perpetrators of the crime, it is incumbent upon him to show that the testimony is inherently unbelievable in order to prevail." (*People* v. *Braun,* 14 Cal.2d 1, 5 [92 P.2d 402]; see, also, *People* v. *Waller,* 14 Cal.2d 693 [96 P.2d

344]; *People* v. *Haydon,* 18 Cal.App. 543 [123 P. 1102, 1114]; *People* v. *Holquin,* 48 Cal.App.2d 551 [120 P.2d 71]; *People* v. *Farrington,* 213 Cal. 459 [2 P.2d 814]; *People* v. *White,* 35 Cal.App.2d 61 [94 P.2d 617]; *People* v. *Foster,* 198 Cal. 112 [243 P.,667]; *People* v. *Harsch,* 44 Cal.App.2d 572 [112 P.2d 654]; *People* v. *Knight,* 44 Cal.App.2d 887 [113 P.2d 226].)

 Witnesses appeared in support of the defenses of alibi. The jury was fairly instructed upon this phase of the case. No contention is made to the contrary. The credibility of a witness and the weight that should be given testimony are matters for the trier of the facts. The conduct, the appearance, the demeanor of the witnesses are all matters that may be considered in determining the truth or falsity of their testimony. A review of the testimony of Mr. and Mrs. Icardi, and reasonable inferences that may be drawn therefrom, substantially support the identification. (*People* v. *Waller, supra; People* v. *Deal,* 42 Cal.App.2d 33 [108 P.2d 103]; *People* v. *Hunter,* 49 Cal.App.2d 243 [121 P.2d 529].)

 As stated, two "guns" were taken from the person of appellant Matas and "an automatic pistol" from Castro upon their arrest in Los Angeles three weeks after the commission of the offense. The weapons were not identified as those used on the occasion of the robbery. However, no objection was made to their reception in evidence. One of the guns is the property of an inmate of San Quentin and Matas was holding it for a loan of $5.00. It is claimed that this testimony was prejudicial to him. The cross-examination of Matas reveals the following: "Q. Where did you get the other gun? A. It is John McGoldrick's. Q. John McGoldrick, who is he? A. Well, he is some boy that was down in Los Angeles. Q. Where is he now? MR. COGHLAN: That, of course, is not relevant, competent or material. THE COURT: Overruled. MR. LYNCH: Q. Where is John McGoldrick? A. He is in San Quentin. MR. COGHLAN: there is no foundation that he knows. MR. LYNCH: He just answered—— where did you say he was? THE COURT: Overruled. A. San Quentin. MR. COGHLAN: I move that the answer be stricken out. THE COURT: Denied." It was essential to prove that the defendant was armed when he perpetrated the offense. A separate verdict upon the charge of being armed is provided in Penal Code section 1158a. Ownership or interest in the weapon

was a circumstance tending to prove this issue. When Matas testified that it was McGoldrick's gun, it was proper cross-examination to find out the business and address of McGoldrick. The entire testimony on this subject does not indicate that the district attorney deliberately tried to connect the defendant with inmates of the state prison but that when Matas answered in reference to McGoldrick that "he is some boy that was down in Los Angeles" it was a proper question to ask "Where is he now" as a means of determining the ownership of one of the guns.

The evidence shows that the defendants were "away without leave" from an army camp "over a month" prior to the commission of the offense; they were apprehended approximately three weeks thereafter. During the trial the district attorney referred to A.W.O.L. as desertion from the army. Appellants claim they were prejudiced by this incident. The record shows the following question asked without objection: "You were a deserter from the Army at that time, weren't you? A. I was A.W.O.L." Further in the proceedings the following appears: "Q. And you were absent without leave? A. AWOL. Q. AWOL, that is another term for desertion? MR. COGHLAN: I object to that. THE COURT: I will sustain that." Under the circumstances the incident does not require further comment.

Convinced that the jury was justified in finding the defendants guilty we leave these trivial contentions to discuss a question which under other facts and circumstances might be declared error.

It is contended that the court erred in a portion of its instruction on reasonable doubt in the respect that it used the following language: "[Y]ou feel an abiding conviction to a moral certainty of the truth of the charge, and you will understand that moral certainty only is required, or, in other words, that degree of proof which produces conviction in an unprejudiced mind." The court failed to follow the exact language of Penal Code, section 1096, which provides that there should be in the minds of the jurors "an abiding conviction to a moral certainty, of the truth of the charge."

The form of the instruction contained in section 1096 is similar to that approved by a former Chief Justice of the Supreme Court of the State of Massachusetts, Justice Shaw, and adopted generally by the courts of California. In 1927,

section 1096 was amended to read as follows: "A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to an acquittal, but the effect of this presumption is only to place upon the state the burden of proving him guilty beyond a reasonable doubt. Reasonable doubt is defined as follows: 'It is not a mere possible doubt; because everything relating to human affairs, and depending on moral evidence, is open to some possible or imaginary doubt. It is that state of the case, which, after the entire comparison and consideration of all the evidence, leaves the minds of jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge.'" A new section was added, designated 1096a, which provides: "In charging a jury, the court may read to the jury section 1096 of this code, and no further instruction on the subject of the presumption of innocence or defining reasonable doubt need be given." (Stats. 1927, ch. 604, p. 1039.)

Trial courts have been repeatedly admonished to follow the Justice Shaw instruction and subsequently the language of section 1096. Failure to do so is simply inviting error. This is emphasized by the act of the Legislature in permitting the section to be read, in which case no further definition need be given. (*People* v. *Kynette*, 15 Cal.2d 731 [104 P.2d 794].) Under such circumstances trial courts should adopt the code definition. Notwithstanding that section 1096a provides only that the definition *may* be given, it is safer to follow the language of the code section than to "struggle for originality where precedent alone should govern." (*State* v. *Morey,* 25 Ore. 241 [35 P. 655, 36 P. 573, 577].) If cases are to be reversed, however, for some slight, harmless misstatement in instructions, the number of reversals will seriously interfere with the fair administration of justice as undoubtedly it not infrequently happens that the guilty are the beneficiaries of them. (*State* v. *Morey, supra.*) We proceed therefore to consider the instruction further. In cases prior to the amendment in 1927 of section 1096, during the period when the Shaw definition was the accepted and approved form of instruction on reasonable doubt, trial courts, though such method was advised, were not required to give such instruction verbatim. There are numerous cases upholding the following: "Indeed, trial courts have been frequently admonished by appellate

courts to conform their definitions upon the general subject of reasonable doubt to this language, rather than to attempt new departures. But it does not follow that to give other definitions constitutes reversible error. It is not error to refuse other definitions if Justice Shaw's definition is given, and, on the other hand, it is not error to refuse Justice Shaw's definition if the term is elsewhere sufficiently defined.'' (8 Cal. Jur. 362-363.) It also appears that when there are several errors, deviation from the instruction formulated by Justice Shaw has been included as a reason for reversal (*People* v. *Schoedde*, 126 Cal. 373 [58 P. 859]), or its absence has been criticized but held not prejudicial when the order of reversal was based upon other grounds.

It should be noted that under code section 1096 the giving of the instruction is not mandatory so that unless there appears a grave discrepancy that misled the jury the judgment may be affirmed. In *People* v. *Soldavini*, 45 Cal.App.2d 460 [114 P.2d 415], a portion of section 1096 was read exactly as it appears, but some of the essential language was omitted and not properly covered in other instructions. The judgment of conviction was reversed. It was held that it was the duty of the court to instruct on general principles of law pertinent to the case. It was also held that the reading of section 1096 may meet the requirement of the rules with reference to ''reasonable doubt,'' but there is no relaxation of the rule that instructions on general principles should be given notwithstanding a failure of defendant to propose instructions.

A reasonable doubt, based upon a rational, as distinguished from an insufficient or conjectural, ground growing out of the evidence or the lack of evidence in a case, often causes instructions to be offered in addition to the instruction in section 1096. In *People* v. *Carson*, 43 Cal.App.2d 40, 44 [110 P. 2d 98], it is said: ''Respondent contends that since the court read to the jury section 1096 of the Penal Code on the subjects of presumption of innocence and reasonable doubt the matter was sufficiently covered and cites section 1096a, which provides that if section 1096 be read no further instruction on the subject of the presumption of innocence or defining reasonable doubt need be given. It is to be noted, however, that section 1096a provides that no further instruction *defining* reasonable doubt need be given. It is not provided therein that no other instruction on the *subject* of reasonable doubt need be given in any particular case.''

In *People* v. *Burnette*, 39 Cal.App.2d 215 [102 P.2d 799]

the exact language of section 1096 was not used. This court at pages 230-231 said: ''Appellant offered an instruction on reasonable doubt. The court refused to give the proffered instruction, but in other instructions he informed the jury that all of the elements of the offense had to be proved by the state to a moral certainty and beyond a reasonable doubt. He also instructed the jury almost in the identical words of section 1096 of the Penal Code on the presumption of innocence and as to the effect and definition of reasonable doubt. This is all that was required. (Pen. Code, § 1096a.)''

 Appellants cite *People* v. *T. Wah Hing,* 15 Cal.App. 195, 200-201 [114 P. 416], for their contention that it was error to add the final portion of the instruction. In that case the trial court gave a separate instruction in the phraseology of the concluding words of the instruction in the present case. The appellate court pointed out that the instruction as thus worded was derived from section 1826, Code of Civil Procedure, relating to actions in general. The section reads: ''The law does not require demonstration; that is, such a degree of proof as, excluding possibility of error, produces absolute certainty; because such proof is rarely possible. *Moral certainty only is required, or that degree of proof which produces conviction in an unprejudiced mind.*'' (Italics added.) The appellant in that case contended that it was error to give an instruction embodying the italicized words of the code section in a criminal case, citing *Treadwell* v. *Whittier,* 80 Cal. 574 [22 P. 266, 13 Am.St.Rep. 175, 5 L.R.A. 498]. The court held in the T. Wah Hing case that considering the instructions as a whole the jury could not have been misled as to the thought embraced in the term ''reasonable doubt.''

In *Treadwell* v. *Whittier, supra,* Mr. Justice McFarland, elaborating upon the remarks of Mr. Justice Thornton, author of the main opinion, observed that use of the terms ''moral certainty'' both in sections 1826, Code of Civil Procedure, and 1096, Penal Code, was ''somewhat confusing,'' that they could not be deemed to have been used in the same sense, since in a civil action not proof beyond reasonable doubt, but upon a preponderance of the evidence is all that is required. This led Judge McFarland to remark that to have used the words ''moral certainty'' in the instructions in the civil case before him would have tended to confuse the jury. Hence he joined in the view of Mr. Justice Thornton that it was not error to strike the words ''moral certainty'' from the instruction as there given. The effect of the decision in that case was to sanc-

tion the omission of the words "moral certainty" in a civil case, rather than to condemn their use in a criminal case, which is now expressly provided for in section 1096, Penal Code. In the case herein use of the terminology of section 1826, Code of Civil Procedure, in concluding an instruction given in the words of section 1096, Penal Code, created no inconsistency in the definition of "reasonable doubt." But the words based on section 1826 might better have been omitted since they did not add to the correctness of the definition and served but to create a controversy on appeal.

Appellants contend that the jury might be "morally certain" of their guilt, and yet consistent with the proper definition of "reasonable doubt," entertain such doubt of their guilt. The words "moral certainty" were not used alone in the concluding part of the instruction, but in turn were defined as "that degree of proof which produces conviction in an unprejudiced mind." Had the court instructed that the jury should acquit unless it was convinced to a moral certainty of the truth of the charges we would have been forced to affirm a conviction. "Abiding conviction" is the equivalent of "settled conviction." (*State* v. *Silverio,* 79 N. J. L. 482 [76 A. 1069].) It is used in the sense of "convince." (*State* v. *Leo,* 80 N. J. L. 21 [77 A. 523]; 36 Words and Phrases (Perm. ed.), p. 298.) When the instruction is read in its entirety it is apparent that the only departure from the statute is in the omission of the word "abiding" before "conviction." But this qualification was supplied by the immediately preceding portion of the instruction by which the jury was told in the language of the statute that reasonable doubt was that state of the case which left their minds in that condition that they could not say they felt "an *abiding* conviction to a moral certainty of the truth of the charge." (Italics added.) The failure to repeat the word "abiding" is not significant and could not have misled the jury. "We must attribute some reasoning power to the jury." (*People* v. *Boggs,* 12 Cal.2d 27, 35 [82 P.2d 368].)

The judgment and the order denying motion for new trial as to each defendant are affirmed.

Peters, P. J., and Knight, J., concurred.

A petition for a rehearing was denied April 7, 1945, and appellants' petition for a hearing by the Supreme Court was denied April 19, 1945. Traynor, J., voted for a hearing.